# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# DANVILLE DIVISION

JANIS WARD,
MELANIE BELOE, and
LORI BERRIOS,

      Plaintiffs,

                                    NO.48-cv-000069

Robert Warren, et als.

      Defendants.                      **JURY TRIAL DEMANDED**

# First Amended Complaint

### Complaint for Civil Rights Violations and Pendant State Claims

Plaintiffs Janis Ward, Melanie Belote and Lori Berrios, through the undersigned counsel, bring this action for declaratory and injunctive relief and damages pursuant to the due process provision under 42 U.S.C.§ 1983; Title VII of the Civil Rights Act of 1964;  the Family and Medical Leave Act, 29 U.S.C. 2611 *et seq.*, the Free Exercise Clause of the First Amendment;  the Search and Seizure Provisions of the Fourth Amendment to the U.S. Constitution; protections against Hostile Workplace Environment under 42 U.S.C.§1983, and Pendant State Claims under 2VAC40 *et seq.*

**FIRST AMENDED COMPLAINT**

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS AND VIOLATIONS OF OTHER FEDERAL LAWS and PENDANT STATE CLAIMS**

**SECTION 1: JURISDICTION AND VENUE**

1.     This is an action, filed in Circuit Court of Pittsylvania County, Virginia, on 11/13/2018, for Plaintiffs Janis Ward, Melanie Belote, and Lori Berrios, and among the violations for which damages are being sought are:

(a)     Due process clause of the Fourteenth Amendment to the U.S. Constitution,

(b).     Protections afforded under the Family and Medical Leave Act,
        29 U.S.C. 2614 (a)(1)

(c)     Age Discrimination, ("ADEA") of Title VII of the Civil Rights Act of 1964,

(d)     Free Exercise clause of the First Amendment to the U.S. Constitution,

(e)     Substantive violations of the Fourteenth Amendment for workplace  violence injuries,

(f)     Amendment 4 of the U.S. Constitution ,

(g)     Protections afforded under the Administrative/Human Resources Manual for Local  Social  Departments.  22VAC40 *et seq.*

( h)   Protections against hostile workplace environment. 42 U.S.C.§1983.

2.  Venue is proper in Pittsylvania County Virginia, where the  alleged violations occurred.

2

3.   This action begins with the Virginia System of Social Services offering to potential social welfare workers, a workplace in which management of the workforce would be in a "fair and equitable manner, consistent with applicable laws, regulations and policies."  EX. A.

4.   Under this strategy, Plaintiffs became "career" workers in the Virginia System of Social Services, obtaining state certifications in various sectors of welfare services.

5.   Plaintiff Janis Ward had  completed 20 years of DSS work experience. P. 62, Par IIIB.

6.  Plaintiff Melanie Belote had completed  13 years of DSS work experience. P.70, Par 103.

7.  Plaintiff Lorie Berrios had completed 10 years DSS work experience. P. 55, Par. III-A.

8. One bedrock provision in the mix of "Laws, regulations and policies" protecting the Social Services workforce is the right of access to the grievance process that is a property interest of every employee who has passed the one year probationary period  in social services work and in work for Pittsylvania County.

9.  The Pittsylvania County Department of Social Services had a standard in-house grievance procedure,  P. 47, Par 122, until  October 1, 2014.

10. On Oct 1, 2014,  the Pittsylvania County Local Department of Social Services Board of Directors, herein after referred to as ('"PCLDSSBODDefendants,") announced a material change to  the Department's grievance procedure, and made that change retroactive to September 1, 2014.  P.48, Par. 125.

11  The PCLDSSBODDefendants  abolished the mandatory steps governing standard

grievance procedures, allowing the Personnel Administrator of PCLDSS to terminate the grievance at any step.  P.37, Par. 88

12.   That amendment  was incorporated and made explicit in the standard grievance procedure that had been adopted  by the PCLDSSBODDefendants . P.36, Par 85.  EX. 6 (1)

13.   The PCLDSSBODDefendants in assuming the right to amend its grievance procedures, thereby made the PCLDSS's  grievance procedure inconsistent with the provision of Code of Virginia §3.2-3000, *et seq*.

14   In effect, the PCLDSSBOdDDefendants made the PCLDSS's grievance procedure void.

### Allegations of Fact: Melanie Belote's Grievance

15.   Melanie Belote, a citizen of the United states. 13 years DSS experience, certified in SNAP, Medicaid and TANF, hired Pittsylvania County Local Department of Social Services ("PCLDSS") 04/2007, upon her termination, began grievance on 12/20/2013; Salary $ 29,000.   P. 70, Par, 103

16.    Belote, a ten year DSS worker, was charged and terminated shortly after Director Flanagan received word of an  occurrence in which  Belote allegedly had failed to attend to a DSS customer  who came into PCDSS without an appointment.  Ex.7, 7-a

17.    Under the DSS Employee Handbook, a unit director is required to appoint a member of his unit as a standby person, to help unexpected and unscheduled walk-in customers.  EX. 8 (J)

18.    Belote was served with a "Notice of Intent," for her termination, EX 7, 7-a, charging her for in that  incident on 11/26/2013, of failing to service the walk -in customer.

19.  The two page "Notice of Intent" issued to Belote on 11/26/2013 by Director Flanagan, is not mere managerial boilerplate; the "Notice" is heated and personal, and expresses an animus toward Belote verging on character assassination, EX 7, 7-a., Flanagan  so  worked up, given the fact that Flanagan ought to have known that  Belote had committed no workplace violation. Ex. 8(J).

20. The DSS Director Flanagan,  is also the author of the Employee Handbook in which it was written that every Unit within DSS had to have a standby appointed, and she knew that  Belote had not committed any violation, because Belote wasn't her unit's appointed standby.  Ex. 8(J).

21.  But as the record of this case will show, *infra,* Flanagan wasted no opportunity  to act in haste at the opportunity  to  destroy an employee.

22.   In Belote's response to the "Notice" she reports that Flanagan told Belote that if Flanagan had been present on that day, "I would not have had a job on Friday due to Class II Violation of the employee manual."  Ex. 9. P. 70, Par 195, 196, 197.

23.   Belote's supervisor and unit head was responsible for the back-up designations and its lapse.  P. 70, Par, 195, 196, 197.

24.   Flanagan had previously disciplined Belote, sending her to "anger management class" for objecting to a prior unfair treatment.   P. 71, Par 198.

25.    On information and belief, Belote was sent to anger management after being assigned to work a second, full-time DSS job without pay, after  Flanagan  left a  vacant position unfilled.    P. 71, Par. 198.

26.    On 11/12/013, Belote was on the phone with another client helping him complete his review form for a Medicaid renewal that was due on that day.  Ex. 9.

27.   Belotes' written response, dated 12/2/2013, states " Ms. Flanagan told me had she been there on 11/12/13 I would not have had a job on Fri. due to Class II violation of the employee manual." EX. 9.

28.   Under the amended  Grievance Procedure,    Flanagan, DSS Director, could make a peremptory termination of any DSS worker, with the right to  terminate that employee's attempted grievance at the First Step.   Ex. 37. Par. 88.

29..  Flanagan's "Notice of Intent" accuses Belote falsely, alleging Belote of "fighting and or other acts of violence in the workplace while engaged in LDS Business," and ends with further threat to Belote:  setting up a meeting with Belote and her supervisor on December 2, 2014 at 10:30 AM, to review Belote's written statement "responding to the fact, evidence and mitigating circumstances." Ex. 7-a.

30..   On 12/19/2013, Belote filed a grievance: "First Resolution Step." EX. 10, and gave it to her Supervisor, acknowledged on 12-20-13.  Ex.11.

31.    On 12/20/2013, Flanagan was notified that Belote had hired counsel, Exs. 13, 13-a.

32.    On12/20/2014, Belote received the "First Resolution Step of her grievance, dated exactly one year after the date that Flanagan was given notice that Belote had hired counsel. Ex. 12.

33.    During the pendency of   Belote 's grievance, it fell victim to the October 1, 2014 amendment allowing the Director to terminate the grievance at any step in the  grievance process. Ex. 6 (1),  P. 37,    Par 88.

34.   Belote possessed a due process right  to  protect her property interest—the grievance procedure --that gave her a lawful right to have her grievance heard and processed in a neutral forum  compliant with the requirements of 42 U.S.C.§ 1983 due process.

35.   Belote was made a County employee by the DSS Manual, Ex. A, and by law, she had a right to bring her grievance within a Pittsylvania County's lawful grievance provisions.

36.  Belote's exhaustion of administrative remedies was satisfied by counsel's notice to PCLDSSBODDEfendants, Board member Ron Scearace, and to  Pittsylvania County's Board of Supervisor, and to  Robert Warren, PCBOS Chairman, to County Administrator David Smitherman, and to County Attorney, Vaden Hunt addressing denial of her right to grievance under  42 U.S.C. §1983 action.  Ex. 1.

37.   The other plaintiffs herein, Lori Berrios and Janice Ward, were victims of the same
constitutional deprivation: denial of their right of access to grieve their wrongful over the
wrongful terminations brought by the Director Flanagan.

38. Berrio's and Ward's employment was under the same terms, policies  and practices  as
Belote's, workers within DSS and employees of Pittsylvania County.  P. 15, Par 35.

39.  Plaintiff Melanie Belote's attempted grievance  illustrates the impact of the
amendment that never ended Belote's grievance, over the course of a year, until exactly
one year to the date after Belote began it, she got notice of Setp II, dated 12.30/2014
EX.  12. Par.28-48 *infra.*

40.   A  most basic  right of an employee who is not "at will" 'is the right to grieve, and Belote
was denied that right when her grievance was never processed to completion.


### COUNT I. MELANIE BELOTE

**Violation of Plaintiff's right  to protect her property interest in her Right
to Grieve an employment action against her  under the due process
provision of the 14th Amendment to the U.S. Constitution.**

**PCLDSSBODDefendans 24 U.S.C. §1983 Violations of Plaintiff Belote's
right to be protected against the hostile and toxic  workplace of the DSS
workplace environment,  in which the conduct was so hostile and toxic
that  it  violated the standards of acceptable conduct for the local
community**

41.   Plaintiffs incorporate by reference all preceding allegations pertaining to Plaintiff Belote and
incorporates by reference all the allegations in Pars. 41 through 122 infra,  as if fully set forth
herein.

42.  At all times relevant herein, DSS Director Flanagan and Plaintiff  Belote were
employees of the Pittsylvania County Board of Supervisors.  ("PCBOSDefendans").

43.   At all times relevant herein, DSS Director Flanagan and Plaintiff Belote worked in
the PCLDDSS building housing the Pittsylvania County Department of Social Services.

44. The acts and omissions of PLDSSDSSBODDefendants, in giving Director Flanagan the apparent authority to terminate Belote for no violation of any workplace rule, constitutes a pattern and practice of the PCLDSSBODDefendants, under color of state law, to acquiesce in any unlawful conduct engaged in by DSS Director Flanagan, in violation of its duties under Code of Virginia §63.2-321, Code of Virginia §63.2-3251,

45. The PCLDSSBODDefendants are vicariously liable for the unlawful acts of Director Flanagan.

46. The Pittsylvania County Board of Supervisors, herein to be referred to as ("PCBOSDefendants"), in failing to terminate the DSS Board upon its unlawful amendment of the Social Services Grievance Procedure, and for failing direct the activities of Director Flanagan, had authority to suspend or remove local board members for cause f Code of. Virginia 63.2-308, and the BOSDefendant's acts and omissions constituted a custom, practice and policy under color of state law, of deliberate indifference to Plaintiff Belote's constitutional rights secured by 42 U.S.C.§ 1983 to access a lawful grievance procedure and to work under terms and conditions in which termination cannot be imposed for lawfully performing one's job.

47. The PCBOSDefendants acts and omissions constitute a custom, practice and policy of deliberate indifference, under color of state law, to Plaintiff Belote's rights secured by the due process protection of the 14th amendment to protect her personnel record from false defamatory entries made by Director Flanagan.

48. The PCLDSSBODDefendants gave Director Flanagan the apparent authority, under color of state law, to disregard the Manual that requires that Pittsylvania County's LDSS "abide by all applicable local, state and federal laws and regulations affecting employment. " Ex. A.

49. BOSDefendants acts and omissions constituted a custom, practice and policy of deliberate indifference, under color of state law, for disregarding all responsibility to

monitor the violations of law engaged in the by the PCLDSSBODDefendants and withint the DSS workplace, knowing that the local community was in an angry uprising over acts of immorality and blasphemy within the DSS workplace that gave offense to the general public and to the local community, all as part of a pattern and practice, under color of state law, resulting in injury to Plaintiff Belote's rights secured by the 1th amendment.

50.  The PCBOSDefendants had the power and the authority to terminate the PCLDSSBODDefendants for cause.  Code of Virginia 63.2-308.

51. The PCBOSDefendants allowed Director Flanagan to act, under their apparent authority, to allow the DSS workplace environment to become an offense to the standards of conduct expected by the local community, and Flanagan was give liberty by her Board of Directors, to impose a wrongful termination against Plaintiff Belote, under color of state law, knowing that she could terminate Belote's grievance before it ever reached any step whatsoever.

52.  DSSDefendants' and. BOSDefendants' acts were, under color of state law, Intentional, willful, malicious, wanton, obdurate and in gross and reckless disregard of Plaintiff Belote's constitutional rights  and rights afforded to the under the Manual. EX. A, all which prohibit forcing workers to work in a hostile working environment, and the PCBOSDefendants knew the sculture within DSS offended the standards of the local community, and with  scandal overflowing out of the PCLDSS in public media, the Defendants failure to act had direct consequences upon the deprivation of  Plaintiff Belotes" constitutional rights and protections.

**Plaintiffs Were Employees of Pittsylvania County.**

53.    The Manual provision, Ex. A, stating that  Plaintiffs  are employees of the locality in which they work—Pittsylvania County--is statutory.

54.    The Commonwealth made all DSS workers into employees of the locality every Local County Department of Social Services in which they are hired to work.  Ex.A. This was a necessary  "legal fiction" created by the Commonwealth, to account for why and how the  locality, in this case Pittsylvania County, is able to pay public monies to Plaintiffs working in its Local Department of Social Services.[1]

55.    The Commonwealth  makes the County responsible for maintaining a payroll in which payments to DSS works, the  Plaintiffs herein, are accounted for, as well as making the County the  employer, with authority to make payroll deductions for  IRS withholdings for Plaintiffs,  taken from the Plaintiff's salaries, and deductions for  social security, for health insurance,  for VRS retirement  benefits, all under the *legal fiction* that Plaintiffs are lawful county employees to whom those monies are owed and for whom the deductions are accounted.

56     The meaning of "Legal fiction" has been summarized as either (1) a statement propounded with complete or partial consciousness of is falsity " or (2) a false statement recognized as having utility. *U.S. v. Alfonozo Coward*, 151 F. Supp. 2d 533, E.D. Pennsylvania, 2001.

57     The utility of fictions of law are considered "to be highly beneficial and useful, and it is 'invariably observed, that no fiction shall extend to work an injury; its proper operation being to prevent a mischief, or remedy an inconvenience that might result from the general rule of law…".citing William Blackstone, "Commentaries on the Laws of England,"  reported in William Draper Lewis, e @ 1056 (1897), and explained  in *U.S. v. Alfonozo Coward, supra.*

---

[1] The individual local departments of Social service are not ordinarily equipped with Human Resources Departments or with Payroll Departments, and by making DSS workers employees of their localities, the administrative costs involving complex DSS budgets and expenses, and large payrolls,  are passed on to the Counties.  Without the legal fiction of making Plaintiffs county employees, the County would have  no legal authority to pay DSS workers, who, as has been observed in numerous judicial opinions, don't fall within traditional definitions defining the employee-employer relationship.

58.     The traditional standards applied to defining the  "employee- employer relationship" are abrogated by the legal fiction that makes Plaintiffs employees of Pittsylvania County.

59     The legal fiction flows in both directions, affording plaintiffs such rights as applying for unemployment compensation, for workers compensation benefits, and the access to grievance, as employees of Pittsylvania County.

60.   In return, the legal fiction gives the PCBOS a lawful right to dispense, out of its budget of tax monies it receives from state and federal appropriations,  specific amounts  in monthly payments to Plaintiffs, as lawful payments to these Plaintiff because under law they are  County employees.  Without the legal fiction of Plaintiffs being County employees, no county monies could be disbursed to them

61.     The legal fiction that allows the PCBOS to pay salaries to the Plaintiffs for doing work in the County's Department of Social Services, as "employees of the locality," flows in both directions, giving plaintiffs right of access to the County's grievance procedure as "employees of the locality, just as they have the  right to claim worker's compensation for on-the-job injuries, or claim unemployment benefits. P. 7, Par 12.

62 Plaintiffs, as County employees assigned to DSS, had no other access to any neutral forum in which to bring employee complaints.  P, 7, Par 12, P. 8. Par. 13, 14, P. 9, Par 15, 16, 17, P. 10, Par. 20, P. 11, Par. 21, 22, 23, 24, P. 12, Par 25, 26, 27,P. 14, Par 33, 34, P. 15, Par. 3, P. 16, Par 37.  And upon  the amendment of the DSS grievance procedures on May 1,2014,  they had no longer had  access to grievance.

63     While the PCBOS was benefitting from the legal fiction of having Plaintiffs on the Locality's payroll, it adopted a policy and practice, under color of law, to deny Plaintiffs their constitutional right of due process to access the county's grievance procedures, in

violation of 42 U.S.C. §1983.   P. 15, Par 35.[2]   The "legal fiction" may not be extended to work an injury.  U.S. v. Alfonozo, *supra.*

### Allegation of Facts: Creation of

### The Pittsylvania County Department of Social Services

64.    The Pittsylvania County Department of Social Services ("PCLDSS") was created by the Pittsylvania County Board of Supervisors ("PCBOS"), pursuant to Code of Virginia §63.2-300 (1950) in which the Commonwealth of Virginia required establishment of a Social Services, by every city and county. P 4, Par. 2-3**.**

65.    The PCBOS adopted a local form of administration of its PCLDSS, by appointing citizens of the County as an advisory board to oversee the PCLDSS as its Board of Directors ("PCLDSSBOD"), to manage and advise the operations within PCDSS on behalf of the PCBOS. P. 6, Par. 9.  Code of Virginia 63.2-305

66**.**   Under Code of Virginia §63.2-302, the governing body appoints a local board, consisting of residents of the County to constitute a local board of directors for the Pittsylvania County Department of Social Services.

67**.**   The governing body is required to appoint a member of the Board of Supervisors ("PCBOS") to be a non-voting*, ex officio member*, of the local board of the County's Department of Social Services, and should he cease to be a member of the BOS, another BOS member must be appointed to fill the vacancy. Code of Virginia §63.2-302.

 68.   The local director of the Social Services Department is appointed by the local board, and the local board employs or authorizes such other employees as required to administer social services in the county. Code of VA. §63.2-325.

---

[2] Plaintiffs property interest under the 14th amendment due process provision, is their Right of  Grievance against adverse employment actions taken against them.

69.    Under Code §63.2-332, the local Director is administrator of the local department and serves as secretary to the local board.  Under supervision of the local Board, the local director shall have the powers and perform the duties of this title.

70.  Under Code of Va. §63.2-321, the local board interests itself in all matters pertaining to public assistance and social services needed by its political locality.

71.  Under Code of Va. §63.2-316, the local Board submits its annual budget to the governing body.

72.  The local Board may receive monies from public grants and to disburse those funds under regulations and fee schedules it may establish.   Code of Va.  §63.2-314.

73.  The local Board directs the activities of the local Director. Code of Va. §63.2-3251.

74.  Under Code of Va. §63.2-332 the local Director is administrator of the local department and serves as secretary to the local board.  Under supervision of the local board, the director has powers to perform the duties of the laws governing local social services**.**

75.    The local Board submits its annual budget to the board of supervisors estimating the amount of money needed to carry out its mandate. Code of Virginia §63.2- 316.

76.    Each member of the local board is paid reasonable and necessary expenses for attending meeting and the governing body may pay out of its general fund, to each member of the local board, compensation for services in an amount fixed by the governing body.  Code of Virginia 63.2-310

77.     No reimbursement out of state of federal funds is used for any part of the compensation paid. Code of Virginia 63.2-310

78.    The local governing body is authorized to appoint members to the local board and has the authority to suspend or remove a member of the local board for cause. Code of Va. §63.2-308.

13

79.    Pittsylvania County subscribes to the laws prohibiting age discrimination in employment.

80.    Pittsylvania County subscribes to the laws giving employees rights under the Family Medical Leave Act. and is a covered employer, and  employs more than. 50 employees on its payroll in  20 or more workweek in the current or preceding calendar year  with a minium of 1,25o hours..

81.   The Pittsylvania County Local Department of Social Services employs more than 50 employees on its payroll in 20 or more workweeks in the current or preceding calendar year  with a minimum of 1,250 hour, and subscribes to the laws giving employees right**s** under the Family and Medical Leave Act and is a covered employer

82.    The Pittsylvania County Local Department of Social  services subscribes to the laws prohibiting age discrimination **i**n employment.

83.  The Pittsylvania County Board of supervisors employs more than 50 employees on its payroll in 20 or more workweeks in the current or preceding calendar year, with a minimum of 1,250 hours.

### Allegation of Facts
### The Development of the DSS Hostile Workplace Environme**n**t[3]

83.  The DSS Board of Directors, is tasked with supervising the DSS Director (Flanagan").

**85.**   Flanagan is also secretary to the Board of Directors, and as secretary she is also a member of the DSS Board of Directors, making the DSS Director a member of the body supervising herself. P. 8, Par 14, P.9, Par. 16.

---

[3] The DSS  Board of Directors Defendants will be referred herein as "PCLDSSBODDefendants" and the Board of Supervisors Defendants will be referred herein as "PCBOSDefendants."

86.  The Pittsylvania County Department of Social Services subscribed, at Attachment O, in its Employee Handbook to "standards of acceptable conduct for the local community,' stating that acts which give offense to the geneneral public, are specifically prohibited.  Ex. D

87.  Beginning some time around the 2014, on information and belief, troubling reports of the working conditions within the PCLDSS came to the public through social media, and which had the effect of unreasonably interfering  with plaintiffs work performance and creating an intimidating, hostile offensive environment for work. P. 18, Par. 44, 45, 46,47, 48,  P. 19,  Par 48

88.   Plaintiff Berrios bought pictures of the offensive behaviors to County Administration, showing that the behavior was unwelcome, offensive, and abusive,

and that gambling was going in in the DSS building.  Among the items of local attention was a toilet with disgusting contents on display in the Director's office.  P. 18, Par. 44, 45

89.  Director  Flanagan made it mandatory, under threat of termination, for plaintiffs to attend events such as watching Flanagan's display of dirty-dancing with her male CPS worker, when Plaintiffs sought to avoid such events in order to remain at their work.  P. 21, Par. 51.

90.   Also of concern to the local community were photographs of the  Halloween Parties put on by Flanagan for DSS children, that showed  costumes worn by some DSS workers  that were unwelcome and offensive to the community and to parents bringing  children into the DSS building to collect their Halloween candy from the DSS worker, an annual event. P. 18, Par 45, 46, 47, 48, 49, 50.

91.   Flanagan also put on "employee appreciation events" and, like the Halloween parties, made attendance mandatory to Plaintiffs, who were unwilling to patriciate in having to watch the offensive costumes brought in by some of the DSS workers. P. 84, Par. 244, 245, 246 247249, 250, 251, 252,253.

92.  The costumes making religious references to Catholicism were especially offensive, as were the costume carrying deviant sexual  messages
P. 19, Par 46, 47.

93..   The local community became angry and concerned about  the behaviors in PCLDSS, finding a growing culture within PCLDSS  "that were so outrageous and so extreme as to go beyond the bounds of decency."    P. 18, Par. 44, 45, 46, 47, 48, P. 84 Par. 244-through P. 87, Par 252-253.

94..   Among the offenders within the DSS building were Assistant Director Cheryl Fisk, whose sexually infused speech and liberal uses of profanities, contributed to the rise of a workplace culture that unreasonably interfered with work performance, and that created an intimidating  and offensive environment for  work . P 19, Par 48, P. 86, Par. 250..

95.  Plaintiff Lori Berrios attempted to report the out-of-control behaviors, bringing to County administration photographs and information that about the gambling in DSS. P, 20 Par 50.

96.   In a response to the  PCLDSSBODDefendants  and the PCBOSDefendants refusal to respond to the community's outrage over conduct in the DSS that had become a county scandal, two respected county residents, Henry Hurt, a local author, and Vic Ingram, a private investigator, pulled it all together and created  a Face Book page that became the source the continuous stream of scandalous reports spilling out of the  DSS.  The site was reached by googling "Sherry Shenanagans."  and it became a open to accepting postings of photos and comments, all dedicated to showing the

vileness and the immorality of the Flanagan cult growing within PCLDSS. P. 86, Par. 248.>  .

97.   The face book offers were a direct response to the failure of the PCBOS to take action after so many months went by of citizens complaining and after months of continuous reports in the media that enraged the local citizenry.  Add to that mx reports from the growing cadres of DSS workers whom Flanagan fired through upon false and defamatory charges allegations and the outrage because she, supported by her small cult  of acolytes who would defend and support Flanagan no matter what, so long as she let them know their jobs were secure.   P. 86, Par. 249.

98.  As the information spread out in a steady pace, public concern arose over the nepotism hires Flanagan made,  hires of children of current DSS workers that, in any  other government department would have been prohibited, but was a common  occurrence in the Pittsylvania County DSS.    P. 81, Par 143.

99.   The hire of Jacqueline Palmer, then under indictment for dealing cocaine, was especially concerning to plaintiffs, fearing that private information about themselves,  accessed from their Personnel files for her Mother, Sue Palmer, headmistress for the cult of Flanagan, made them fear becoming identity theft victims. P. 82 Par. 239.

100.  Plaintiffs took a stance of being an unwilling audience to Flanagan's behavior at "employee appreciation" events, and Flanagan made a rule saying that attendance was mandatory,  under threat of termination,  and she demanded they attend, even  when they preferred to remain at their work.   P. 21, Par 51, 52, 53 54, 55, 56, 57, 58, 59, P. 86 Par. 250.

101.   Flanagan kept as display on her office desk the trilogy, "Fifty Shades of Grey," a fictional compendium of sexual deviancy.  Plaintiffs were concerned that a public display of those books, in their Department, sent a very unsettling message to

the community and to DSS customers and to the teen aged children who were DSS customers.  P.87, Par. 253.

102.    The PCLDSSBODDefendants attempted to handle the bad publicity by holding a public/open  Board Meeting on August 3, 2018.  P. 26, through P. 29, Par 68.

103    It proved so unsuccessful in stopping the flow of adverse commentaries, that four months after the Railroad Station meeting, the DSS Board terminated Flanagan and terminated itself, in effect, a corporate suicide.  P. 29, par 68. P. 16. Par. 40.

104.  The Richmond politicians at  VADSS were so unsettled by  news of the DSS Board's terminations, that they sent out to Pittsylvania County, the Commonwealth's Atty. General to investigate. P. 30, Par. 71.

105.  The AG's investigation had nothing to do with  PCLDSS's internal dysfunctions. The VADSS earlier had done a "Monkey Survey"  to investigate  the validity of reports of workplace problems at PCLDSS, but only found dozens of violations of managerial failures pertaining to record keeping. P. 30, Par 71.,72

106.   Even Virginia's Commissioner Duke Storen had come and investigated, in person, and saw nothing alarming within PCLDSS. P.17, Par 43.  He thought the full- size toilet in Flanagan's office was a birthday  cake.

107.  This time the A.G. was not called into investigate DSS; he was called in to investigate Ron Scearce, the BOS liaison to the PCLDSSBOD.

108.   After her termination by the PCLDSS Board, Flanagan had gone  to Richmond, weeping, claiming that Supervisor Scearce's reports to the BOS about her were defamatory.

109.  Flanagan claimed  the PCBOS wanted to take over PCLDSS, and even claimed that her life was in danger due to Ron Scearce. P. 30 Par. 72.

110.   But the PCBOS clearly  never ever wanted anything to do with the toxic headache that was Flanagan, or anything that would require them to  have to deal  with  taking over the PCLSDSS mess she had created.  P. 31, Par. 74, 75.

111 .  Flanagan claimed Scarce was defaming her, was trying to get the county to terminate her  to allow the county to take over running "her" department of Social  Services P. 30.  Par. 72.

112.  On information and belief, the VADSS voted to bar Scearce from continuing  his appointment by the PCBOS  to the PCLDSS Board of Directors, as its liaison from the governing bod, and Richmond created a job there for Flanagan.

**Allegations of Fact: Plaintiff Janis Ward**

113 .Ward, a citizen of the Unites States,  was state certified as Eligibility Benefits Specialist II, for TANF, MED, SNAP; hired PCLDSS on 4/1/13/, annual salary $38,000, last day worked 03/31/2018, hired as Benefits Specialist II Intake, with 20 years seniority as  DSS employee.

114  Ward was passed up for promotion to supervisor in favor of a close friend of Flanagan, Sue Palmer, whose inexperience resulted in long lines of complaining customers waiting to be processed for Benefits. P. 62, Par. III- 168, 169.

115  When customers asked Ward to explain the holdup and confusion, Ward replied that it was a problem of administration.    P. 62, PAR. 169.

116.  Soon, Asst. Dir. Fisk told Ward that should never say anything derogatory about DSS administration or she'd be fired. P. 62, Par. 169.

19

117.  Ward was targeted for termination in retaliation for reporting workplace violence from multiple attacks on herself by employee Tanika Glass, who sprayed Ward with disinfectant spray, causing Ward to develop COPD, a serious lung condition that interfered with her breathing and required medical treatments.  P. 63, P.170-171.

118.   Flanagan refused to discipline Glass, and Ward was eligible and approved to take FMLA leave from 5/1/2016 to 6/13/2016. P. 63, Par 172.

119.  When Ward returned to work on 6/13/2016 from FMLA leave she was ready and able to return to her original job as Benefits Specialist II,

110.  Ward learned upon her return to work on 6/13/2016  that Flanagan willfully and maliciously, and in violation of FMLA  29 US.C. 2925 (a)(1), had put a permanent replacement into  Ward's Benefits Specialist II position with far less experience and seniority than Ward, in retaliation against Ward for taking FMLA leave. P. 63. Par 172, 173

111  Flanagan wantonly willfully maliciously and under apparent authority of her employers (The DSS Board of Directors and the PCBOS), assigned Ward to a position in Fuel and Cooling programs, in which Ward had no training or certification.

112.  Flanagan's malicious and retaliatory reassignment against Ward also violated the provision in the Manual concerning reinstatement of a worker to her original position, or an "equivalent position" with "comparable duties, and conditions of the previous position".  Manual, P. 64, Par 173.

113. Ward was put in Fuel and Cooling just as the cooling season became busy at the onset of summer, and was Flanagan's intention to force Ward to quit. P. 63, Par.172 .P. 64, Par 173,

114. Because the disinfectant attacks made Ward ill with difficulty breathing, on two occasions Ward called in to report she would be coming in late to work, before reporting time for work.  P. 64, Par. 174.

115.  Flanagan told Ward there was a 15  minute Rule about time to report coming late to work. P.64, Par. 174.

116.  On two occasions Ward called in, once at 8:17 and once at 8:21, and Flanagan used those two reporting times as a terminable offense and terminated Ward. P. 65,  Par 175-176.

117.  However no 15 minutes" "Rule" was in the DSS Employee Handbook under its listing of "RULES." Ex.25

118   The "Manual" instructs workers to follow its personnel policies and procedures for LDSS, and in case of any conflict between these policies and law, the applicable legal requirements will prevail. EX A.

119.  The "Manual "  does not contain a "15 minute Rule" authorizing  termination of a worker for non-compliance of a rule it does not have,  and the Manual the "applicable law."

120. Flanagan told Ward she could be terminated for violating the 15 minute "rule", but offered Ward the option of retirement. P. 65, Par 176.

121.   Ward was again served with "Notice of Intent" on 1/10/2018, citing violation of the alleged 15 minute rule,

122.   She was placed on administrative leave without pay, and Ward was sent for drug screening, without probable cause, for allegedly calling in 2 minutes in violation of an alleged 15 minute."  P. 65, Par 176

123.  Flanagan offered Ward the option of retirement instead of termination, offering up her usual threats of contaminating a Personnel Record   if Ward refused to retire.

124. When Ward refused to accept retirement, Flanagan maliciously and in retaliation for her refusing to retire, ordered Ward to submit to a drug screening under threat of termination, and put Ward on unpaid administrative leave. P. 65, Par. 177.

125.   This was done without probable cause and was violation of Ward's Fourth Amendment Right to be free from unlawful search and seizure, and in violation of 42 U.S.C. § 1983 for putting Ward on unpaid administrative leave.

126.   Instead of sending Ward for a blood screening, Flanagan had duty to send Ward for Worker's Comp Benefits; Flanagan knew. Ward was ill from the disinfectant spray Ward had left her in, without disciplining the aggressor Glass. P. 66. Par 180.

127.  Flanagan knew that Ward's illness, COPD was the direct result of the disinfectant sprays upon her by co-worker Tanka Glass in repeated episodes of workplace violence, and Ward was ill, not inebriated.

128.   The PCLDSSBODDefendants had a duty to concern itself with terminations of long term DSS workers and had paid no attention to Flanagan's harassment of Janis Ward.

129.   Defendant DSS Board of Directors had nullified the DSS Grievance Procedure, making it impossible for Ward to access a grievance process that was in compliance with 42 U.S.C. § 1983.   P. 48, Par 125.

130.  On 5/5/17 Ward was given a verbal warning and a written notice. EX 19-a.

131.   On 9/11/2017, Ward was issued another Notice and instead of being told she had a right to file for worker's compensation benefits for the workplace injuries she had suffered and developed COPD. EX.19-a.[4]

132.   Ward recognized that Flanagan was trying to get rid of her. EX. 21

133.   After Ward's drug screen came up negative,  Flanagan scheduled another threatening meeting for Ward, "to discuss further consequences to be imposed on Ward,"  because Ward's blood test was negative.  P.65, Par. 178.

134.     At the meeting, Flanagan told Ward would be terminated if she didn't take retirement.  Under duress, Ward didn't want to retire, and continued to work until March 31, 2018, which was under retirement.  P. 66 Par. 179.

135.     Flanagan told Ward about another employee who was not being allowed  to return to work because she had "health issues and it was time for her to retire also." P. 66 Par. 182, P. 67, Par 184.

136.   Flanagan told Ward, with the apparent authority of her employer, to "retire and enjoy her senior years."   P.66, Par. 182.

---

[4] In Ex. 19-a, Section "Employee is Expected to do the Following: 'It is the "policy of the commonwealth" and described therein is a fabrication; the DSS Manual contains no such policy; this is Flanagan legislating, again, in violation of EX. A, which states that the workplace is governed in a matter consistent with applicable laws, regulations and policies.  It doesn't give  a DSS Director authority to legislate, which is what Flanagan' Board of Directors did on May 1, 2014, or more likely did at Flanagan's instruction,  to change the DSS grievance procedures.

137.   Flanagan also threatened to give Ward future bad references if she would not resign.  P. 66, Par 183, p. 67, Par. 184, in violation of Ex. B(x).

138.  The "Manual" prohibits "threatening, coercing or physically assaulting persons associated with LDSS, including employees, supervisors…and contractors." Ex. B.

139.  Three days after her 07/17/2018 meeting with Flanagan, Ward sought to begin a grievance with Flanagan, requesting by letter that her retirement be reconsidered.          P. 67 Par. 185

140.  Flanagan stopped Ward's grievance at Step 1, saying that she would never reconsider Ward coming back to work.  P. 67, Par. 185.

141.  Ward already lost her right to grieve, because in 2014,  the PCLDSS Board of Directors voted to allow "management" to stop a grievance "at any step in the process."   P. 48, Par 125.

142.  Flanagan called a meeting of Senior DSS workers to inform them of Ward's retirement and the reason had to leave work Ward, invading Ward's right to the privacy of her Personnel records.    P 68, Par 186.

143.   Flanagan wasn't yet finished harassing Ward: she threatened to have Ward's grandchildren taken away from her and to charge Ward with welfare fraud on a mistaken belief that Ward had custody of her grandchildren. P. 68, Par. 189-90.

144.      Upon that threat, Ward's mental and physical health collapsed and Ward lost much of her normal body weight so that she became even more ill from the COPD.       P. 69, Par. 190.

145.  With the loss of regular income, with far less from her retirement, and upon the peremptory termination without time for planning, Ward was forced to file for

bankruptcy, developing serious depression for which she has to take serious medications.  P. 69, Par. 190.

146   On review of her PCLDSS Record, in 2018 pursuant to a FOIA, she discovered Flanagan had falsified her record with additional late report times that didn't occur, and of which Ward had never been confronted.

147.   Ward discovered in 2018 when she obtained her Personnel file, that Flanagan had inserted violations that Ward never saw:  EX. 22 charges a 6/6/17 violation vs. EX 24: 6/6/17: Ward's time sheet shows 8 full hours worked;   EX 22: charges 7/10/17 violation—EX 23: 7/10/17 Ward's time sheet shows 8 full hours worked.

148.   Further, Ward asserts that the "LDS Written Notice Form' she signed, EX 22, did not have those additional violations on it when she signed it, and that she had never checked the "yes" box in Section IV.

149.   On or about May 3, 2018, and well before the 300 days allowed to timely bring notice to the EEOC, Ward sent her pre-charge inquiry to the EEOC upon Age Discrimination grounds.   EX 26.

150.   Ward exhausted her administrative remedies in her  EEOC pre-charge inquiry attributing the ADEA discrimination while working in the Pittsylvania County Department of Social services.

151.   Ward's Notice of pre-charge inquiry was also sent to Supervisor Ron Scearce, the supervisor-liaison appointed to the DSS Board, to give the DSS Board Notice of her intent to bring an action for age discrimination along with providing notice to the PCBOS.  Ex. 26.

152.    Ward had repeatedly sought to grieve the workplace abuses she suffered from injury in workplace violence, and her due process violations, her constitutional violations, and her unlawful termination

153.   The PCLBOSDefendants refused Ward access to its grievance process and PCLDSSBODDefendants amended their  DSS grievance procedure  into a nullity, leaving Ward with nowhere to turn to vindicate her constitutional rights other than to become party in  litigation.

154.   Ward exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964, by having given to Supervisor Ron Scearce, a member of the DSS Board of Directors,  notice of the EEOC pre-charge inquiry, attributing that under the authority  of Assistant Director Fisk the discrimination was allowed. The charge was made fewer than 300 days of the date the discrimination occurred and on October 16, 2018, Ward received her right-to-sue letter and timely brought her claim to court on 11/13/2018.  Ward brought hercharge  in fewer than 300 days after Ward had    to retire or be terminated, receiving her right-to-sue letter dated October 16, 2018,  Ex. 27, and bringing her Title VII complaint to court timely on November  11, 2018, in the Circuit Court of Pittsylvania County, Va, subsequently removed to this Court.

# COUNT II: JANIS WARD

**Violation of rights secured under the due process clause
of the Fourteenth Amendment, 42 U.S.C.§ 1983 (grievances denied),**

**Violations of protections under the Family and Medical Leave Act of 1993,
29 U.S.C. 2601 and retaliation
Violation of the substantive due process provision of the Fourteenth
Amendment (workplace violence and injury)
Violation of her rights under Title VII, ADEA of the Civil Rights Act of 1964
Violation of her of free exercise right  under
Amendment 1 of the U.S. Constitution**

**Violation of her right against search and seizure,
Amendment 4 to the U.S. Constitution
Violation of her right to work in a
Non-Hostile  Environment 42 U.S.C. §1983**

155.  **Plaintiffs incorporates by reference all preceding allegations from  Par. 53 through Par. 112, supra,  and Par. 113 through Par.143, supra, and Par. 71 through Par 154.** *supra*, **as if fully set forth herein,**

156.  At all times relevant herein, DSS Director Flanagan and Plaintiff Ward both were employees of PCBOSDefendants .

157.  At all times relevant herein Plaintiff Ward worked in DSS where Flanagan was supervised by PCLDSSBODDefendants.

158. At all times herein, the PCBOSDeffendants  had authority to remove all the members of the PCLDSSBODDefendants from their Board positions for cause, for failing to do their job of controlling Director Flanagan's unlawful conduct, under Code of Virginia  §63.2-308,

159.  The acts and omissions of both the  PCBOSDefendants and the PCLDSSBODDefendant  were so culpable as to constitute authorization of, and acquiesce in, the unlawful and malicious harassing conduct by  DSS Director Flanagan against Plaintiff Ward, under color of state law, and for the  creation and perpetuation of a hostile and offensive work environment in violation of the protections  afforded Ward under of 42 U.S.C. § 1983,  that prohibits deviation from the standards of conduct acceptable for a local community; and by allowing the offensive and prohibited conduct by DSS workers  to have persisted for years  that had upset the local citizenry as going beyond all tolerable local standards defining human decency, in sum the DSS behavior that violated acceptable standards of conduct for the local community.  EX. D

160.  "PCLDSSBODDefendants" and the PCBOSDefendants  are jointly and severally liable for the unlawful acts by  Flanagan's violating Ward's Title VII protections, under

27

color of state law, violating with malice and in  retaliation Ward's  rights to return to her work from leave in a comparable position, for Defendants' allowing Flanagan, under color of the apparent authority  and under color of state law, to discriminate against Ward based upon her age, 70,allowing Flanaganto  forcing Ward under the apparent authority of defendants,  to retire against her will, using unlawful threats in violation of the manual Ex. B(x), and violating Ward's due process rights,  falsifying her Personnel Record without providing Ward opportunity to respond, and altering Ex. 22 , adding additional violations against Ward after she had signed the document,  in violation of 42 U.S.C § 1983, and violating Ward's first and fourth amendment rights, and for violating Ward's due process right access the County's grievance procedure, and for violating Wad's due process right by voiding the DSS's grievance procedure on May 1, 2014.

161.    Both the PCLDSSBDDefendants and the PCBOSDefendants' acts and omissions constituted a custom, practice and policy of deliberate indifference to Plaintiff Ward's constitutional rights secured by 42 U.S.C.§ 1983, by Title VII, by the FMLA and by Article I and Article 4 of the U.S. Consitution.

162.    Both PCLDSSBODtDefendants'  and PCBOSDefendants' acts and omissions constituted a custom, practice and policy of deliberate indifference to Plaintiff Ward's rights secured under the  FMLA, 29 U.C.A. 201 *et seq, and for* giving Flanagan the apparent authority to act  maliciously and retaliatory toward Ward, threaten Ward, and to force her to retire because of she was age 70.  Flanagan acted with the full authority of PCLDSSBODDefendants and PCBOSDeffendants, , including in her he malicious and retaliatory refusal to return Ward to a comparable position upon her return from FMLA leave*.*

163.  Both the PCLDSSDSSBODDrefendants  and the PCBOSDefendants acts and omissions constituted a custom, practice and policy of deliberate indifference to Plaintiff Ward's rights secured by Title VII of the Civil Rights Act of 1964, allowing Flanagan, with the apparent authority of DSS defendants, to threaten and coerce Ward into

retirement because of her age, and in violation of the Manual which prohibits Flanagan from threatening and coercing DSS workers.  Ex. B.

164.  Cheryl Fisk, Assistant DSS Director acted under the apparent authority of the PCLDSsBODDefendants to interfere with Plaintiff Ward's free exercise right under the first  Amendment of the U.S. Constitution, and Defendants are  are vicariously liable for the damages she caused.

165.   Both PCLDSSBODDefendants and the PCBOSDefendants' acts and omissions constituted a custom, practice and policy under color of state law, of deliberate indifference to Plaintiff Ward's rights to be secure in her person, that right secured by the  Fourth  Amendment to the U. S. Constitution.

166.   Both DSS and BOS Defendants' acts and omissions constituted a custom, practice and policy of deliberate indifference to Plaintiff Ward's Fourth Amendment rights, allowing Flanagan, acting with their  apparent authority, and under color of state law, to send Ward for blood screening, when there existed no probable cause amd when they knew that Ward was ill with COPD.

167.   Both PCLDSSBODDefendants  and PCBOSDefendants' acts of omission and commission were Intentional, willful, malicious, wanton, obdurate and in gross and reckless disregard of Plaintiff Ward's constitutional rights.

168    Ward suffered profound and life-altering conditions as a result of the abuse carried out against her by Flanagan, under the apparent authority of the PCLDSSBODDefendants, and the PCBOSDefendants, allowing her to be repeatedly injured through workplace violence.

169.  Both PCLDSSBODDefendants  and PCBOSDefendants' acts of omission and commission allowed Ward to become a victim of workplace violence which caused her to develop the incurable medical illness of COPD.  Defendants had a duty to know that Flanagan, the DSS Director, sought to remove Ward from employment by deliberately

allowing Ward to be injured by co-worker Tanika Glass, so that Ward would be no longer able to work. Flanagan acted with the apparent authority of the Defendants to perpetuate and protect the continuation of this scheme, all in knowing, willful and deliberate indifference to the harm and injury Ward was sustaining, and in violation of the duty of protection that Flanagan, the DSS Board of Directors and the Pittslvania County Board of Supervisor owed to Ward, and both PCLDSSBODDefendants and PCBOS'Defendants are jointly and severably liable for the injuries Ward sustained in workplace violence and defendants are vicariously liable for the acts of Flanagan, who was acting under their apparent authority allowgin Tanika Glass to continue the workplace violence against Ward, with no consequences to Glass. Ex. E, Ex-C-1. Defendants acts were were Intentional, willful, malicious, wanton, obdurate and in gross and reckless disregard of Plaintiff Ward's constitutional rights.

170.  Ward left employment from DSS with an incurable medical condition—COPD--impacting every facet of her life, her ability to sleep, her ability to breathe, her ability to walk, her ability to enjoy good health, that she possessed before defendants knowingly and willingly and deliberately gave Flanagan, under their apparently authority, and undr color of state law,  to make Ward into a victim of workplace violence .  P. 43 Par 114.

## Allegations of Fact: Lori Berrios

171.  Plaintiff Lori Berrios, a citizen of the United States, was hired into PCLDSS in 2/2007, bringing 2 years' experience from Danville DSS, and in her employment with PCLDSS, had  a total of ten years of DSS experience.  Salary $37,000.

172.   Berrios was forced from employment on 8/17/2015 working as state certified Intake, Benefits Specialist II.  P. 55, Par IIIA.  When she refused to resign, Berrios was threatened by Director Flanagan that her Personnel file would be filed with multiple reports of workplace violations. P. 58, Par 159.   Berrios was victim of the unlawful threats and coercions by Flanagan, in violation of the Manual, EX. B , the most serious

of offenses,  a serious group III offense warranting immediate termination of Flanagan.
Ex. B(G).

173. Flanagan's threats to force an employee to sacrifice a right to grieve, in order to
prevent contamination of a personnel record, is, itself, a due process violation under 42
U.S.C.§ 1983.

174. Berrios sought grievance through  Pittsylvania County's HR, and was denied as
ineligible because she wasn't a county employee.    P 55, Par IIIA, 153.

175.    On 7/27/2015, Berrios was injured at home, called in on 7/28 to report out sick,
and on 7/30/2015 Gretna ER reported Berrios too ill to work. P. 55, Par 155.

176.   On 7/31/2015 Berrios was called back to work due to no coverage for Intake,
Berrios' certified specialization. P. 55, Par 155

177.   On 7/31/2015, Berrios brought in her Accident Disability Report to have signed in
order to receive short term disability. *Id.*

178.  Berrios worked a short time on 7/31/2015, on the case Flanagan had called her in
to work, leaving file unfinished on her desk to go home on disability.  P.55-56, Par 155.

179.  On 8/03/2015 Berrios was called in to report to Director Flanagan, with Palmer as
witness, and was charged with falsifying the case narrative on the file Berios had left
unfinished on 7/31/2015 when she went out on short-term disability.

180.  On 7/31/ 2015, Berrios claims she had left the case unfinished.  P55-56, Par 155-
156.

181.  On 8/03/2015 Berrios was called back to work to be faced with charges of falsifying the case she left uncompleted on 7/3 worker for Berrios work,

182.  The charge of   falsifications  was "discovered" by Palmer, Flanagan's close ally and friend.

183 .  All the allegations on Flanagan's Ex.15, "Notice of Intent"    falsely alleging violations by Berrios on client's files, dating from August 3, 2015 through August 14,2015.

184 Berrios was on administrative leave from August 3, 2015  until  August 15, 2015. EX.17.

185. Violations alleged against  Berrios, on leave on those dates, that were charged and documented by Flanagan on the  "Notice of Intent"  were fabricated by Palmer and Flanagan who had motive and opportunity to falsify the record; Flanagan wanted to terminate Berrios, and Palmer was on first base to assist her.

186.   The Notice of Intent" appears to state that the brother of the DSS customer stated he had not spoken to anyone on July 31, but most important and easy to overlook is that the brother stated that on July 31, 2015 "he had not spoken with anyone at our agency *in regards to income verification* on that date**."**  So yes, he had spoken to someone on July 31, 2015 : Berrios.

187.  As Inake, that is exactly what Berrios' did in her job: income verification.  A documented verification of the case on was made July 31, and the case was approved.

188    On  August 4 ,2015, when the brother called out to challenge the meagre benefit that was awarded, and was asked about "heating expenses, instead of denying he ever spoke of "heating," he now was simply denying he ever spoke to anyone on 7/31.

189.  But the clause that "he never spoke to anyone about "income verification" on 7/31 means that he did speak with Berrios in 7/31 about "something" and on Aug. 4, 2015 was trying to change his story after Berrios had documented  "heating expenses" and authorized a benefit of $16 when the customers  were expecting $200 in benefits.

190.  When questioned about "heating expenses" the brother  backed down and he responded  that his mother was dead and that his brother lived alone, not insisting that he never said anything about heating expenses, but  still insisting that he never spoke with anyone on the 31st.

191.   He then changed his story and said that the money he gave his brother was a loan and that should not have been counted as income.

192  From this jumble of information,  Flanagan decided that Berrios falsified the record of a welfare customer who was changing his story to get increased benefits, and Flanagan used it to terminate Berrios for falsifying a document.

193.    This  sequence of facts discloses that the brother had reported the money he gave to his mother and brother as heating expenses and that Berrios properly documented it as such, but learning that the welfare benefit wasn't going to be $200 a month and instead was $16 a month, he called back on  August 4 to change the story. Ex. 15.    Berrios was not at work on August 4, Ex. 17.

194.  Flanagan's narrative jumbles facts: Berrios did the documentation based on a report of heating expenses.   Ex.15.

195.  When the Brother called back and was asked about the "heating expenses" his story changed, replying that his mother was deceased and his brother lived alone.

196.   He also explained away the heating expenses as being  money he gave his brother as a loan.  EX. 15.

197   Flanagan decided that the welfare amount was incorrect and that Berrios had counted the loan as income. Ex. 15.

198.  However, because the brother had denied speaking with anyone on July 31 about "income verification," with Berrios the only one  working Intake on that date, Berrios could not have known about a "loan." Ex. 15

199.  Flanagan's narrative documents a  story from a welfare scammer who belatedly realized and regretted the information he had given to Berrios on July 31 about heating expenses.

 200.   Flanagan jumped at the opportunity to bring falsification charges against Berrios upon this incoherent story being peddles to her a potential welfare cheat.   . Ex,15, P. 56, Par 158.

201.   To make this  an even more terminable offense against Berios, Flanagan accused Berrios of never attempting to retrieve the case and correct the information on Monday August 3, when whem Berrios was out on administrative  leave. EX.15, EX. 17

202,  Flanagan's "Notice" reports that Berrios, on August 3, the day Flanagan called Berrios in to charge her with falsifying that record,  had received the "correct information" about the money that the client's brother gave to the client, and "never attempted to retrieve the case from the ongoing worker and correct the information". Ex. 15.

203.   The disconnect is that brother reported that he called on  *August 4* to tell Berrios about the mistake and Flanagan; on *August 3*, 2015, Flanagan  was charging Berrios in with failing to correct a mistake  that had not yet been reported.  Ex. 15.

34

204.    The subsequent cases Flanagan purports to have investigated from Berrios' files, Ex. 15-15-a, discovered by Berrios when she FOIA'd her Personnel Records in 2018, are all, on Berrios information and belief, closed cases due to disqualifications or other reasons for terminations of cases.

205. . Berrios stated that an on-going worker had a responsibility to check back with the Intake worker, before making any changes impacting the benefit amount.

206.   Palmer didn't do that, and she conspired with Flanagan to bring false charges against Berrios without affording Berrios any opportunity to respond.  On 8/17/2015 Berrios thought she was terminated.    P. 57 Par. 157.

207.  Palmer never checked with Berrios about the case narrative, and Palmer gave the customer $200 in benefits, the maximum.  P. 56, Par. 156.

208.  Palmer and  Flanagan  both decided  that Berrios had falsified the narrative of the case, and immediately decided to charge Berrios with falsification of the record.  P 56 Par. 156.

209.  Both Flanagan and Palmer rushed to make charges against Berrios on 8/3/2015, while Berrios was out of the office, calling  Berrios back in on that day to terminate Berrios, while she was out on short term disability.  P. 57,Par 157.

210.    Flanagan ordered Berrios home on paid administrative leave, for two weeks and said  she would investigate more of Berrios files. P.57, Par 157.

211.  On 8/17/2015, Berrios returned for the scheduled meeting with Flanagan and was told  that Flanagan had been away  during those two weeks and had done nothing to investigate Berrios case load. P. 57, Pa. 158

212  Bringing Berrios into her office, Flanagan presented Berrios with a termination form, the "Notice of Intent", EX. 15,  listing  many charges of falsification of documents against Berrios, without giving Berrios an opportunity to review the document.

213.  Berrios stated that none of it could be true, and Flanagan then presented Berrios with a specific case file and said that the customer reported that Berrios never interviewed her. P. 57 Par 158.

214.  Berrios recognized the file as a fraud case recently caught by Berrios and referred to the DSS invaginator and to Palmer, responding in full with the details. P, 57 Par 158.

215.  Berrios reported that the customer had just been released from jail for welfare fraud, and Berrios had interviewed her and reported the case to Fisk, Palmer and Hankins, the Fraud Investigator. P. 58, p. 158.

216.  Flanagan said she had already called Richmond about Berrios falsification of the record, and that Berrios should quit, or she would fire Berrios and give her bad references. P. 58, Par 159.

217.  Flanagan began typing Berrios' resignation, and Berrios said she was not going to sign, and instead, Berrios scribbled a resignation on a scrap of paper pulled from the pile of papers she had brought with her for her meeting with Flanagan , changing her mind and shoving back into her pile of papers she had brought with her. P 58,Par. 159.

218.  When Flanagan realized Berrios wasn't going to sign a resignation, she escorted Berrios out of the DSS biding, separating Berrios from her papers. P.59, Par. 158

219.  Berrios considered herself terminated then, on 8/17/2015. She  went to County administration to file a grievance, and requested to report to  County administration about the indecent behavior, nepotism, gambling and huge employee turnovers in

PCLDSS, and left photos with the obscene toilet display then in Flanagan's office.  P. 59, Par. 160.

220.    In 2018, Berrios obtained her personnel file and discovered that Flanagan had stolen Berrios handwritten resignation left in Berrios' papers when Flanagan put Berrios out of the DSS Building, and found  her scribble that became an official resignation. EX 18.

221.   Flanagan had also put into Berrios Personnel  File a  large number of falsified charges that Berrios had never seen. P. 59 Par.162.  Ex.15, 15-a.

222.    EX. 15:  Flanagan's  "Notice of Intent"  to Berrios is dated 8/11/2015, the date Flanagan purports to have given it  <u>to</u> Berrios, and is  filled with multiple allegations of falsification of documents, never  given to Berrios.

223.   Berrios also had never  seen the  "Consequences" page EX  16, dated August 10, 2015.

224.   Berrios had been out on administrative leave on August 10-11.  EX. 17.

225.    Flanagan falsified  the "Notice of Intent" and notice of 'Consequences,' backdating them to Aug, 11, <u>after</u> her  8/17/2015 meeting with Berrios.  Ex. 15-16.

226     The "resignation" Berrios hastily wrote and refused to hand in on 8/17/15, was erroneously dated by Berrios as 8/11/2015. Berrios was out on Administrative leave on August 11, 2015.  Ex.17. P. 57 Par 158.

227.    Berrios  also  points out that she had neglected to cross the T's in "Pittsylvania" because she had been so upset at that meeting.

228      Under the Count's Personnel provisions, a resignation not on a bona fide form "shall be regarded as not voluntary" and disregarded by the county, but DSS Board of Directors  offered no such protections for DSS workers.  P. 38, Par 92.

229.      Flanagan  copied the date-Aug 11, 2015, from the Berrios "resignation" making  it appear that Berrios had been confronted with the charges against her on that date, and had resigned on that date, making Berrios ineligible to grieve her wrongful termination.

230    Flanagan had long targeted Berrios for retaliation over Berrios' report made in the  Railroad Hearing, and for Berrios questioning Flanagan's removal  and destruction of expensive workstations from the new DSS Building. P 60 Par 164.

231.    Berrios  knew that Flanagan concealed an  illness affecting DSS workers at an "employee appreciation day," Flanagan telling the workers it was  a Noro Virus caught from an employee, when the illness was caused by the  catered lunch brought in by Flanagan.  P. 60, Pa.164-165.

232.    Flanagan concealed the source of the contagion to avoid paying sick-leave time to affected workers.    P. 60, Par. 163, 164, 165. P. 55 Par. (b)

233.    Berrios reported Flanagan's deception to a BOS member , and he ordered to give the workers pay for their sick leave.  P. 55 Par. (b).

234.    Flanagan's retaliated against Berrios for Berrios observations and reports of Flanagan's misconduct, Berrios' questioning the removal of custom-made work stations from the new DSS building, P. 60,  Par. 164,165, and  for reporting  the workplace violence by Glass, a terminable offense.  Ex C, Ex. C-1.

235.  Under the apparent authority of the Defendant DSS Board of BOS Directors, Flanagan falsified Berrios Personnel Records, then falsely reported Berrios to Richmond authorities giving Berrios no opportunity to defend herself.

236.   Flanagan stole Berrios' unsubmitted, handwritten resignation, after removing Berrios out of the DSS building, to separate Berrios from her papers.

337.   During her employment in DSS,  Berrios was forced to work in a hostile environment that included  a toilet displayed in the Director's office in full view, supplied with replicas of  disturbing content and red-tinged water. P. 18, Par 44, 45, 46, 47, 48,

338   The workplace environment and included hearing Asst. Director Cheryl Fisk's publicly announcing details of her sex life with her geriatric husband. *Id.*

339.  The workplace environment also included  hearing  Cheryl Fisk spewing profanities throughout  the DSS building. *Id*

340.   Berrios was compelled by Flanagan to attend "employee appreciation event" to watch Director Flanagan dirty dancing with a male CPS worker, under threat of termination by Flanaganif she didn't attend and preferred to  remain at her work station and do her work;  P. 21, Par. 51

341.   Brerios was shamed by the Halloween costumes co-workers put on for the DSS children's Halloween party, that included Cheryl Fisk as Lorena Bobbitt, carrying a bloodied knife and an item graphically representing what Bobbitt had done to her  unfaithful husband P.19, Par. 48.

342.   Berrios was ashamed to be in the company of  Cheryl Fisk who attended a Halloween event for DSS children wearing a  garbage can titled "white trash," *Id in full view of customers* coming in for benefits who knew first hand how it felt to be  called "white trash." Because they were poor enough to qualify for DSS benefits.'

39

343.   Exposure of  the  ongoing  behaviors within the premises of the DSS was, to the community outside of PCLDSS,  conduct "so outrageous and so extreme as to go beyond the bounds of decency, violating community standads of acceptable conduct for the local community. " P. 18, Par. 44, EX. D.

344.   Berrios sought to obtain her grievance rights and was denied  as ineligible under the direct authority of the PCBOS,  P. 55, Par IIIA.  because she "wasn't a county employee" and as a result Berrios was plunged into life-altering poverty and the humiliation of becoming a customer for the same DSS benefits that she had granted to others as a DSS worker. P. 62, Par 167.

345.   Berrios' workplace injuries from workplace violence, occurred under the apparent authority given to Flanagan by the PCLDSSBODDEfendants, who allowed Flanagan to reward Crews and Glass, by not terminating them for inflicting workplace injuries upon Ward and Berrios. EX. C, Ex. C-1.

346.   Under the apparent authoritiy and  direction of the PCLDSSBODefendants, and to smooth away  the liability for Berrios' workplace injuries, Flanagan forced Crews to apologize to Berrios, and attempted to force  Berrios to hug Crews in foreignness. P. 59, Par 163, 164, 165, 166.

347.   Berrios had no hugs for Crews, who had caused Berrios to suffer an episode of PTSD. P.61, Par 166.

348.   Under the apparent authority of the PCLDDSBODDefendants BOS,    Flanagan took  whatever actions she could  to Berrios force  resign from  DSS  employment while simultaneously terminating her upon false and fabricated violations.

349.   Under the apparent authority of the PCBOS and PCLDSSDefendants, Director Flanagan was allowed to run the PCLDSS unsupervised and unaccountable for the injuries she inflicted upon Plaintiffs Berrios, Ward and Belote.

350.  Plaintiffs had nowhere to turn grieve their unjust and unlawful terminations.

351. The  pressure put on Berrios to allow Crews to apologize for the workplace injury she sustained and Flanagan demanded that Berrios hug Crews in forgiveness  was unwelcomed by Berrios.  P. 60,  Par 163 164, 165, 166.

# Count III: LORI BERRIOS

**Violation of rights secured under the due process clause of the Fourteenth Amendment**
**42 U.S.C.§ 1983 (grievances denied),**
**Violation of the substantive due process provision of the Fourteenth Amendment (workplace violence and injury)**
**Violation of her due process right to confront and respond to all allegations;**
**42 U.S.C. §1983 for falsification of Personnel Records**
**Theft of her handwritten resignation**
**Violation of right of protection against hostile workplace environment**

**352.  Plaintiffs incorporate by reference all preceding allegations as set forth Pars.156-351 as if fully set forth herein.**

353.  At all times relevant herein, DSS Director Flanagan and Plaintiff Berrios were employees of Defendant  Board of Supervisor ("PCBOS"), and they both worked in the workplace in which PCLDSSBODDefendants  had supervisory authority over DDSS Director Flanagan.

354.   Under the apparent authority given to Director Flanagan by PCLDSSBODDefendants, Berrios was subjected, under color of state law,  to retaliatory termination, losing health insurance, depriving her of surgery needed to restore her

ability to walk, unlawful rermination, and denial of her right of accdess to.a lawful grievance procedure.

355.  Berrios  lost the income she depended on to support her three children as a single parent, and suffered the humiliation of having to apply for food stamps where she once worked, upon the violation of her Fourteenth amendment due process right to grieve her unjust termination, and in retaliation for reporting Flanagan's unlawful conduct. P. 44 Par (b).

356.    The acts and omissions of PCLDSSBODDefendant, under color of state law, were so culpable as to constitute authorization of, and acquiesce in the unlawful conduct of  DSS Director Flanagan against Berrios, threatening Berrios  and coercing her to resign or be terminated and to have her Personnel Records contaminated, a due process violation.

357.    PCLDSSBODDefendants  are  vicariously  liable to Berrios for the unlawful acts of carried out by Director Flanagan, under color of state law, in giving Flanagan's apparent authority to  falsify Plaintiff Barrio's employment records.

358.    PCLDSSBODDefendants  acts and comissions constituted a custom, practice and policy of deliberate indifference to Plaintiff Berrios constitutional rights secured by 42 U.S.C.§ 1983 by their amending the DSS greiveance procedure to  denying Berrios access, under color of state law, access to a lawful grievance procedure.

359.  Defendant Pittsylvania County Board of Supervisors, ("PCBOSDefendants'") acts and omissions constituted a custom, practice and policy of deliberate indifference to Plaintiff Berrios's substantive due process rights secured to her by the 14th Amendment  and both PCLDSSBODDefendants and PCBOSDefendans are vicariously liable for failing to  protect  her from harm from  workplace violence, under color of state law, causing her to suffer from PTSD. EX. C, Ex. C-1.

360.    PCLDSSDBODDefendant's acts and omissions constituted a custom, practice and policy of deliberate indifference, under color of law, to Plaintiff Berrios' right to work in an environment uncontaminated by constant profanity and unwarranted sexual disclosures made by the DSS Assistant Director and others.

361. Plaintiff Berrios was caused  distress and  embarrassment in being forced to participate in the DSS Halloween programs that created a hostile and toxic workplace environment where co-workers in came costumes intended to give offense to the general public, and to the  DSS  children and their parents, and that  were offensive to anyone in the community subscribing to the religious beliefs of  Christianity, which conduct  gave offense to the general  public and local community.

362.   PCLDSSBODDefendants  are liable to Berrios for forcing her,  under their apparent their authority and under color of state law, to leave her work to attend employee appreciation events to watch  Director Flanagan dirty dancing with her  male CPS worker, acts which gave offense to the general public and local community and to Berrios.

363.    PCLDSSBODDefendants are liable to Berrios  for allowing Flanagan, under color of their apparent authority, to force Berrios, under color of law,  and under  threat of disciplinary action,  including termination, to attend the DSS Halloween parties for children in which co-workers costumed themselves as a Catholic priest, a mad man, apregnant nun, a white person labelledl " White Trash', and someone as Lorena Bobbitt, and to terminate Berrios if she had remained at her work station doing her job and objected to participate in acts that gave offense to the general public and to the local community.

364. .PCLDSSBODDefendants acts and omissions constituted a custom, practice and policy of deliberate indifference, under color of law, to Plaintiff Berrios' right  to practice her religion without being harassed and ridiculed over her religious preferences, by

allowing Christianity  to be disparaged in the  DSS workplace to give offense to Berrios and the general public.

365.  PCLDSSBODDefendants acts and omissions constituted a custom, practice and policy, under color of law, of deliberate indifference to Plaintiff Berrios' rights to observe her faith without being forced to attend a hostile workplace event in which her faith was being ridiculed right in front of her.

366.   PCLDSSBODDefendants acts were Intentional, willful, malicious, wanton, obdurate and in gross and reckless disregard of Plaintiff Berrios'  constitutional rights.

367.  The PCBOSDefendanta are liable to Berrios for denying her right of access to its grievance procedure, as a county employee, to grieve her unlawful termination.

368.  the PCBOSdefendants  and the PCLDSSBODDefendants are liable to Berrios for the worpklace injuries she sustained from Tanika Glass after the PCLDSSBOD failed to monitor the activities of Flanagan, who allowed the injuries to occur, and after the PCBOSDefendants, failed to respond to the community anger  concerning the deviations from community standards of behavior that were occurring within DSS, and reported to the  PCBOS over a period of many months.  Both defendants acts were inteintionl, wllfl, malicious , wanton and in gross and reckless disregard of Berios constitutional right,  allowing the injuries and losses to Berrios, under color of state law and denying her access to her property right to the grievance procedure unavailable in the PCLDSS due to the illegal amendment to the DSS grievance rules, , and unavailable to Berrios by the BCBOS under their policy and practice of unlawfully denying Berrios access to the county's grievance procedure as a county employee,  to grieve her unlawful termination by Flanatan.  Defendants are vicariously liable for the unlawful acts y Flanagan, for failing to properly monitor her conduct and by the PCBOSDDefendants for refusing to take action upon receiving reports from Ron Scearce about the unlawful and hostile work environment occurring in the County's Department of Social services, that was so serious and dangerous, that in the absence

44

of any input form the PCLDSSBOD defendants and the PCBOSDefendanta, the DSS Board of directors elected to terminate themselves and to terminate Flanagan ,out of respect of  the community which had been offended by the conduct within the PCDSS for almost four years.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs pray for judgment as follows:

A.  Compensatory and liquidated damages dating back to termination or forced resignation dates of Plaintiffs' from  DSS employment .

B.  An order of  Reinstatement to their former positions with seniority.

C. Compensatory  Damages suffered from  workplace violence injuries upon Ward and Berrios.

D.  Compensatory and liquidated damages upon Ward's Title VII complaint.

E.  Compensatory and liquidated damages on Wards FMLA complaint.

F.  Compensatory damages on violations of Ward's 1st and 4th Amendment rights and protections.

G.  A Declaration that Belote prevailed in her grievance within its legal time limits, and order of back pay with interest to Ward and liquidated damages.

H.  The cost of medical expenses to Berrios for surgery on her knees, the condition exacerbated by her loss of medical insurance upon her unlawful termination and denial of access of her right to grieve her termination.

I.  Pre-and post judgment interest as allowed by law.

H. An order enjoining the Pittsyvania county Department of Social services, from proving any information about Plaintiffs herein, based upon documentations made by Sherry Flanagan.

I.  Reasonable costs and attorney fees incurred in bringing this action,

and

I.   Such other relief as the Court deems just and proper.


### Jury Trial Demand

**Plaintiffs hereby demand a trial by jury on all count so triable.**

Respectfully submitted;

ss//Barbara Hudson


Barbara Hudson, VSB #33746
P.O.Box1227
Chatham, VA 24531
(434) 432-2722
Bh60201@yahoo.com